# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CYNTHIA POTOCKI O/B/O <br> ROBERT S. POTOCKI, <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting <br> Commissioner of Social Security,[1] <br><br> Defendant. | No. 16 C 7264 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Cynthia Potocki ("Ms. Potocki"), on behalf of Robert S. Potocki ("Mr. Potocki"), seeks reversal or remand of the decision of the Acting Commissioner of Social Security ("Commissioner") denying Mr. Potocki's claim for Disability Benefits Insurance ("DIB") (doc. # 13: Pl.'s Br. in Supp. of Reversing or Remanding the Decision of the Comm'r). The Commissioner has filed a motion for summary judgment and memorandum in support asking the Court to affirm its decision (doc. # 15: Commr's Mot. for Summ. J.; doc. # 16: Def.'s Mem. in Supp. of Mot. for Summ. J.). For the reasons that follow, we remand the case on the basis that the Appeals Council erred by not considering the new and material evidence of Mr. Potocki's Naval Reserve records.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On September 7, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 6).

## I.

Ms. Potocki filed two applications for Child's Insurance Benefits[3] on behalf of her brother, Mr. Potocki, on January 31, 2013, alleging disability beginning on July 15, 1968 (R. 270-75).[4] The Child's Insurance Benefits claims were denied initially on June 26, 2013, and upon reconsideration on April 25, 2014 (R. 140-47, 156-61). Mr. Potocki then received a hearing, appearing via telephone, before an Administrative Law Judge ("ALJ") on October 28, 2015 (R. 28-74). On January 25, 2016, the ALJ issued an opinion finding that Mr. Potocki was not disabled prior to attaining the age of 22 (R. 10, 13). The Appeals Council denied the request for review, making the ALJ's determination the final decision of the Commissioner (R. 1-6). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

Mr. Potocki was born on June 17, 1950 (R. 75). To qualify for Child's Insurance Benefits, Mr. Potocki needed to establish a disability on or before the age of 22, which was June 16, 1972 (R. 32, s*ee* 20 C.F.R. § 404.350(a)(5)). He graduated from high school (R. 55-56, 299) and attended one semester of college (R 424). Thereafter, on January 14, 1970, Mr. Potocki enlisted in the Naval Reserve (R. 446). Mr. Potocki graduated from boot camp and was then on reserve duty, reporting once a week as a seaman apprentice for almost a year (R. 52). Mr. Potocki was honorably discharged from the Naval Reserve on November 19, 1970, "by reason of being not physically qualified for retention in the Naval Reserve: (schizophrenic reaction,

---

[3] The claims were based on the Social Security benefits of Mr. Potocki's deceased parents, Anne Lorraine Kalata and Stanley Theodore Potocki (R. 80, 294, 323).

[4] On the same date in 2013 that Mr. Potocki applied for Child's Insurance Benefits, he also applied for Supplemental Security Income Benefits ("SSI") (R. 270-71). He was found disabled at the initial level based upon a psychological evaluation with psychologist J. Goebel, Ph.D., with a diagnosis of features of a schizoid personality in a report dated June 11, 2013 (R. 79-85). This report listed an alleged onset date of July 15, 1968, and an established onset date of December 31, 2012 (R. 85). Mr. Potocki's SSI benefits were thereafter terminated for non-medical reasons and resources (R. 402).

chronic, undifferentiated)" (R. 325, 454). After he was discharged, the only job Mr. Potocki ever held was at his father's furniture store where he was a helper and delivered furniture until 1976 (R. 55, 60-61, 299). He has not worked since that time (R. 299).

On April 3, 2013 and May 29, 2013, Ms. Potocki submitted Third Party Function Reports addressing how Mr. Potocki's illnesses, injuries or conditions limit his activities (R. 316-26, 347-57). On May 30, 2013, Mr. Potocki also completed a Function Report addressing how his conditions limit his activities (R. 337-46).[5] The Reports described Mr. Potocki as a recluse who lived under the shelter of his parents since before he turned 22 years of age (R. 45, 319-322, 325, 343, 350-351). He is fearful of doctors and leaving the house (R. 45, 325, 350). Ms. Potocki cares for him long distance (she resides in California) by arranging for Meals on Wheels and other caretakers, and holds a power of attorney for him (R. 316-26, 347-57). Mr. Potocki was diagnosed with schizophrenia when he was 17 or 18 years old (R. 325, 338, 354). At that time, Dr. Marvin Ziporyn and a doctor at Ridgeway Hospital placed Mr. Potocki on medication (R. 325).[6] He experienced seizures and was hospitalized although the record is not clear when this occurred (R. 325).

### III.

The ALJ held a hearing on October 28, 2015. The administrative record does not contain medical reports other than those from Mr. Potocki's time in the Naval Reserves, which were obtained only after the ALJ issued his opinion. However, at his hearing, Mr. Potocki testified that prior to his time in the Navy, he was under the psychiatric care of four or five doctors

---

[5] Mr. Potocki's friend, David L. Ivanich, assisted in completing the form for him (R. 345).

[6] None of Mr. Potocki's doctors' reports were located.

3

including: Dr. Phillips, Dr. Rogers, Dr. McLaughlin, and Dr. Marvin Ziporyn (R. 55).[7] While the record is devoid of any medical documents from these doctors, the record contains several cancelled checks payable to Robert L. Phillips, Ph.D. and Dr. Michael Rogers from 1967 to January 1970 (R. 280-83, 404).

Mr. Potocki was in the Naval Reserves and graduated from boot camp at Great Lakes (R. 51-52). He then attended reserve duty once a week for about a year at the Armory as a seaman apprentice (R. 52). During this time, Mr. Potocki reported experiencing "profound memory loss" and being "handicapped" and not functional (R. 52-53). He stated he was "walking around in a daze" and "couldn't remember anything" (R. 53). Mr. Potocki testified that people noticed he had problems, that he was "unreachable," "want to battle" him, said things like "there's no use telling you nothing or to try to teach you anything because you're going to forget it anyway," and "you better get this guy out of here before he gets hurt" (R. 63).

Mr. Potocki's father took him back to Great Lakes to the psychiatric ward where he was interviewed by a psychiatrist (R. 52, 54). At the time of the ALJ hearing, Mr. Potocki did not have a copy of the psychiatric report (R. 54). The ALJ referred to the report as "key" (R. 54). Plaintiff was able to obtain a copy of it after the ALJ wrote his opinion and submitted it as new and material evidence to the Appeals Council on March 4, 2016 (R. 7-9, 422-479). Mr. Potocki was honorably discharged from the Navy when he was 19 years old in 1970 (R. 51, 55).

Mr. Potocki worked for his father at his furniture store for about five or seven years, until 1976 or 1977 performing menial tasks such as washing windows, wrapping packages, loading the furniture on the truck, helping the driver and delivering furniture but "nothing mental" (R. 60-61). If his father was not the boss, Mr. Potocki would not have been able to work for anybody

---

[7] The hearing transcript notes Martin Bourne (phonetic); however, the Naval Reserve records refer to a Psychiatrist, Marvin Ziporyn, M.D. (R. 55, 470). We gather that the correct name is Marvin Ziporyn and will refer to him as Dr. Ziporyn.

4

(R. 60). Mr. Potocki testified that he "couldn't remember nothing," he could not think logically and he was "always in a daze" (R. 60). The truck driver told Mr. Potocki what to do because he knew something had happened to him and he was a nice guy (R. 61). His co-workers told Mr. Potocki that he was lucky he had his father, because if it wasn't for his father, nobody else would hire him (R. 65). His co-workers always helped him and spoon fed him how to perform tasks over and over again (R. 65). Mr. Potocki testified that he was "weird" in the way that he talked; people said to him that "you're on Mars" and that "you live in your own private world" (R. 65). Mr. Potocki stopped working at the furniture store because his mental ability to function was getting worse and he could not function (even in a limited way) anymore (R. 61).

In November 2015, three of Mr. Potocki's first cousins filed unsworn statements describing their recollections of Mr. Potocki prior to the age of 22. Mr. Thomas Korzenecki wrote that it was commonly understood in the family that Mr. Potocki was depressed, withdrawn, non-social and in general, "not normal" (R. 400). It was also common knowledge that Mr. Potocki's father gave him "make work" in order to get Mr. Potocki out of the house and keep an eye on him during the day because he would not have been able to work for an employer in the normal competitive job market (R. 400).

Ronald Koch recalled that Mr. Potocki was always under close supervision of his family because he demonstrated odd behaviors; he acted in a paranoid way, thinking that someone was always watching him, listening in on his conversations, or spying on him (R. 421). He would say things like, "[d]on't talk so loud because 'they' might be listening" (R. 421). He even would cover the walls in his room with "tin foil" so "they" would not be able to listen (R.421). Mr. Potocki worked at his father's furniture store for a while but it "was not considered a serious job;" rather, it was a way to get Mr. Potocki out of the house in a closely supervised setting (R.

5

421). Mr. Koch observed that Mr. Potocki did not trust people outside his extended family and this lack of trust extended to medical personnel (R. 421).

Mark Lindhurst wrote that Mr. Potocki was obsessed with the imaginative world, did not have very many friends and, after his semester at Northern Illinois University (NIU), "he was not the same person" and no longer got together with the family at holiday reunions (R. 423-24). Mr. Potocki told his cousin stories of NIU being in the "wilderness, surrounded by wolves howling in the night, and that the student body was entirely composed of bullying meat-eaters whose sole purpose in life was to make [Mr. Potocki] see how worthless his life was" (R. 425). He reported meeting similar people in the Navy as he did at NIU (R. 426). In Mr. Potocki's view, people "only hurt you, humiliated you [or] are out to get you" (R. 426). While working for his father, Mr. Potocki would only do the "lifting and moving, and absolutely refused to have any dealings with the customer" (R. 426).

Mr. Lindhurst went on to describe various incidents that occurred over the years showing Mr. Potocki's instability (R. 427-29). One such incident occurred after Mr. Potocki's dog, Duncan, died (R. 428). The cousins received a call from their aunt asking them to come over to console Mr. Potocki (R. 428). They held a burial service in the back yard (R. 428). A year later, Mr. Potocki dug up the grave, retrieved the remains of the dog and reassembled it on the kitchen table (R. 428). His parents came home "to be greeted by this gruesome vision" and he would not rebury it until Mr. Lindhurst and his brother came over to help convince him it was the right thing to do (R. 428). He then bought a three foot high Viking statute for a grave marker and likened it to the movies, for "when you die, you should have your dog at your feet" (R. 428).

At the conclusion of Mr. Potocki's hearing, the ALJ granted Mr. Potocki's attorney 30 days to obtain any additional evidence on behalf of Mr. Potocki, including any Navy records and

doctors' reports (R. 51, 73). The ALJ stated numerous times that the Naval Reserve records and the Naval Reserve psychiatric report "would be key" (R. 36-38, 41-42, 44, 46-50, 54). However, plaintiff's attorney was unable to obtain the Naval Reserve records prior to the time the ALJ issued his opinion (R. 22, 405).

### IV.

On January 25, 2016, the ALJ issued a written opinion finding Mr. Potocki was not disabled within the meaning of the Social Security Act prior to attaining age 22 (R. 13). First, the ALJ found that Mr. Potocki was born on June 17, 1950 and had not attained the age of 22 as of July 15, 1968, the alleged onset date (R. 15). By way of background, the ALJ discussed Mr. Potocki's claim that he was schizophrenic (R. 15).

> Schizophrenia is a form of psychosis, a shift from reality [WebMD]. Psychotic symptoms usually emerge in men in their late teens and early 20's, and seldom occur after age 45. It is often characterized by abnormal social behavior and failure to recognize what is real, with common symptoms including false beliefs, unclear or confuse[d] thinking, auditory hallucinations, reduce[d] social engagement and emotional expression and lack of motivation with diagnosis based on observed behavior and the person's reported experiences and clinical assessment by a mental health professional using criteria in Diagnostic and Statistical Manual of Mental Disorders, 5th Edition [2013] [DSM-5].

(R. 15-16). At Step One, the ALJ found that Mr. Potocki had engaged in Substantial Gainful Activity ("SGA") during the periods of 1970, 1971, and 1972 because he earned sufficient income and Mr. Potocki was able to follow instructions in order to help deliver furniture to the customers, lifting and carrying furniture from store to truck and off the truck into customers' homes (R. 15-16). The ALJ found that it appeared Mr. Potocki did the work "satisfactorily" since no contrary evidence was introduced (R. 16).

The ALJ was not persuaded that Mr. Potocki's work for his father was performed under "special conditions" (R. 16). He found the work was not done in a sheltered workshop or as a patient in a hospital but rather he performed "hard physical labor" riding the delivery truck,

7

listening to the driver, lifting and carrying furniture off the truck into the customer's home and placing it where he was told (R. 16). Additionally, the ALJ surmised that the deliveries had to be made on a scheduled basis, and found no evidence that the driver allowed Mr. Potocki to stop, or reduce his workload (R. 17). Further, Mr. Potocki did not testify that he received special assistance, worked irregular hours, took frequent rest breaks, was provided with special equipment, was able to work only because of specially arranged circumstances, or worked at a lower standard of productivity or efficiency than other employees (R. 17). The ALJ concluded that Mr. Potocki's earnings met the level of SGA for calendar years 1970, 1971 and 1972, thus, he did not qualify for benefits for this period (R. 17).[8]

The ALJ found there was a continuous 12-month period during which Mr. Potocki did not engage in SGA and the remaining findings addressed that period of time (R. 17). At Step Two, the ALJ determined that prior to Mr. Potocki attaining the age of 22, "there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment" because Mr. Potocki did not furnish contemporaneous medical evidence or contemporaneous corroboration of the mental illness (R. 17). The ALJ stated that Mr. Potocki did not provide contemporaneous medical evidence, or medical evidence, that reasonably related back to on or before his 22nd birthday (R. 18). He addressed Mr. Potocki's reliance on *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir. 1998), for the proposition that "what is required is contemporaneous corroboration of the mental illness ... not necessarily medical corroboration" of the mental illness (R. 18). However, the ALJ stated that a "*mental impairment* must be *established by medical evidence* consisting of signs, symptoms, and laboratory findings not only by claimant's statements of symptoms" (R. 18, emphasis in original).

---

[8] For the 17 ½ months from the alleged onset date of July 15, 1968 through the end of 1969, the ALJ determined that Mr. Potocki's earnings did not meet the level of SGA (R. 17).

8

The ALJ acknowledged that Mr. Potocki was found disabled beginning December 31, 2012 on his SSI claim, with an alleged onset date of July 15, 2012, and that his child's insurance benefits claims were denied under his parents' earnings records due to lack of evidence prior to age 22 (R. 19). The ALJ reviewed the Mental Status Examination conducted by clinical and social psychologist James B. Goebel, Ph.D, on June 11, 2013, for Mr. Potocki's SSI claim (R. 19). Dr. Goebel diagnosed features of schizoid personality disorder, but did not offer an opinion as to how long Mr. Potocki's condition existed (R. 19). The ALJ found that Mr. Potocki did not testify, or report to Dr. Goebel, that he had trouble following instructions or needing redirection on the job with his father, driver, or the public (R. 21). Finally, the ALJ recognized Ms. Potocki's report that Mr. Potocki had "mental dysfunction," memory loss and severe anxiety and had "been like this since 18 but each yr. progressively worst" which the ALJ noted was evidenced by Dr. Goebel's Mental Status Examination, but many years after Mr. Potocki turned age 22 (R. 21). Thus, the ALJ found there was little to persuade him to disagree with the Social Security Agency experts that originally reviewed and denied Mr. Potocki's claim that the Mental Status Examination related back to on or before Mr. Potocki attained the age of 22 (R. 19).

The ALJ afforded little weight to the statements of Mr. Potocki's cousins. He noted that these were not sworn statements and the cousins were not mental health specialists (R. 20). In addition, the ALJ noted that the cousins did not have first-hand knowledge of everything they described (R. 20-21). The only evidence in the cousins' statements that the ALJ found helpful to Mr. Potocki's case was the story of his "gruesome" experience with the deceased dog (R. 21).

The ALJ also gave little weight to the treatment Mr. Potocki allegedly received from Dr. Rogers and Dr. Phillips before he entered the Naval Reserves. The ALJ questioned "but what else?" in looking for evidence to corroborate the claim of disabling schizophrenia or other mental

illness (R. 21). The ALJ found that cancelled checks from this treatment, without accompanying "record/annotation/notes" from the father or doctors verifying the "purpose/treatment/impairment," failed to corroborate or establish Mr. Potocki's disability before age 22, since he was functioning at a level which allowed him to complete high school, one semester of college, join the Navy, and work for his father until 1976 (R. 21-22).

Finally, the ALJ found the third party cousins' statements unpersuasive because, "no matter how odd, or even chilling, the anecdotes of [Mr. Potocki's] behavior recounted by the cousins, [Mr. Potocki] was functioning ok outside the home at school and work, until, at least, age 22, as recounted," despite the representations that Mr. Potocki was sheltered by his parents, had limited exposure outside his home and needed his sister to manage his affairs via power of attorney (R. 22). The ALJ stated perhaps this was true but only after he stopped working and after he turned age 22 (R. 22). Prior to that time, the ALJ found the record did not show a medically determinable impairment and stated there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment on or before the date last insured and, even if there was an impairment, it was not severe enough -- in light of Mr. Potocki's admitted functioning -- to require calling a medical expert (R. 22).

## V.

On February 3, 2016, Plaintiff filed a Request for Review with the Appeals Council (R. 267-68). On February 5, 2016, the National Personnel Records Center sent Plaintiff Mr. Potocki's Naval Reserve records from January 7 through November 19, 1970 (R. 442-79) and on March 4, 2016, Plaintiff submitted these records as new and material evidence to the Appeals Council (R. 7-9).

The Appeals Council denied the Request for Review without explanation on May 12, 2016, stating only that "[w]e found no reason under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review" (R. 1). Furthermore, in the section "What We Considered" the Appeals Council simply stated "[i]n looking at your case, we consider the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council. We found this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 2). The Order of Appeal Council lists the brief from Plaintiff's attorney and the records from the National Personnel Records Center as additional evidence made part of the record (R. 5).

## VI.

We review the ALJ's decision deferentially to determine if it is supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff alleges several grounds for reversal and remand: *first*, that the Appeals Council erred by not considering new and material evidence; *second*, that the ALJ erred by finding that Mr. Potocki did not perform his work under special circumstances; and *third*, that the ALJ erred by finding Mr. Potocki did not have a medically determinable impairment prior to age 22. Because we find remand is appropriate on the first ground, that the Appeals Council erred by not

11

considering new and material evidence, we need not address Plaintiff's remaining arguments raised in support of remand.

**A.**

The Social Security Administration regulations require the Appeals Council to review a case if it receives additional evidence that is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) and (b), *see also Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). Our ability to review the Appeals Council decision "is dependent on the grounds on which the Council declined to grant plenary review." *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015). If the Appeals Council deemed the evidence as new, material and time-relevant but concluded that the evidence does not demonstrate that the ALJ's decision was "contrary to the weight of the evidence," then the Appeals Council's decision not to engage in plenary review is not subject to review. *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997), *see also Stepp*, 795 F.3d at 722, *Barth v. Colvin*, No. 13 CV 7788, 2015 WL 7180094 *6 (N.D. Ill. Nov. 16, 2015).

On the other hand, if the Appeals Council reviewed the evidence and concluded that it did not qualify as new and material, the Court may determine whether the Appeals Council committed legal error in applying the regulation. *See Stepp*, 795 F.3d at 722, *Farrell*, 692 F.3d at 771. We find ourselves in line with this analysis as the Appeals Council's boilerplate denial language more closely aligns itself with that of the *Farrell, Stepp,* and *Barth* cases then the *Perkins* case. *Farrell*, 692 F.3d at 771-72; *Stepp*, 795 F.3d at 717, 721, 723-24; *Barth v. Colvin*, 2015 WL 7180094 *6; *Perkins v. Chater*, 107 F.3d at 1294.

12

In *Farrell*, the Appeals Council's decision stated that it "considered ... the additional evidence ... [and] found that this information does not provide a basis for changing the Administrative Law Judge's decision." 692 F. 3d at 771. In *Barth*, the Appeals Council "wrote that it 'looked at' the evidence Barth submitted, 'considered whether the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence of record,' and 'found that this information does not provide a basis for changing the [ALJ]'s decision.'" 2015 WL 7180094 *6. And, in *Stepp*, the Appeals Council stated it had "considered the reasons [Stepp] disagree[d] with the decision and the additional evidence listed on the enclosed Order of Appeals Council," and concluded that "this information d[id] not provide a basis for changing the [ALJ's] decision." 795 F.3d at 717, 721.

As in *Stepp*, 795 F.3d at 723-24, the Appeals Council here listed the relevant evidence in an exhibit list (R. 3) but did not evaluate or provide an analysis of the content of the new records. Rather, the Appeals Council stated that it "found no reason under our rules to review the Administrative Law Judge's decision" (R. 1), and that it had considered the "reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council" but found the information did not provide a basis for changing the ALJ's decision (R. 2). We conclude that this minimal treatment of Mr. Potocki's Navy Records from 1970 by the Appeals Council was a rejection of these records as non-qualifying (not new and material) under the regulation. Thus, we review that finding for legal error. *Stepp*, 795 F.3d at 725; *Barth*, 2015 WL 7180094 *7.

B.

We find it clear that Mr. Potocki's Naval Reserve records are "new and material" within the meaning of the regulation. 20 C.F.R. § 404.970(b); *see also Stepp*, 795 F.3d at 725. Records

13

are "new" if they were "not in existence or available to the claimant at the time of the administrative proceeding." *Stepp*, 795 F.3d at 725. There is no doubt that Mr. Potocki's Naval Reserve records were in existence because they pre-date the ALJ's hearing by decades. But, the materials were not "available" to Mr. Potocki within the meaning of the regulation, because while his attorney actively and diligently sought these Naval Reserve records from the National Personnel Records Center, he did not receive them until after the ALJ's opinion.

Evidence is "material" pursuant to the regulation if it creates a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Stepp*, 795 F.3d at 725 *quoting Perkins*, 107 F.3d at 1296. The Naval Reserve records are from January through November 1970, the relevant time frame of Mr. Potocki's claim of impairment as he states an alleged onset date of July 15, 1968 (R. 85). In addition, throughout the ALJ's hearing and in his opinion, he referred to the lack of medical evidence from the time Mr. Potocki was 18 until he reached 22 years of age, and continually asks plaintiff for medical evidence for that time period (R. 16, 17, 18, 19, 22, 37, 38, 39, 41, 54). Moreover, we need not speculate about the importance of records for that time period, as the ALJ himself said that these medical records were "key" to his analysis and held the record open for an additional 30 days for Mr. Potocki to submit them beyond the hearing date (R. 54, 19). The ALJ's decision rested in large part on the determination that there was no medical evidence corroborating the diagnosis of a mental impairment during the relevant time period (R. 16-19, 22). The Naval Records fill in this evidentiary gap by providing the direct medical evidence that on August 18, 1970, Mr. Potocki reported "nervous trouble and depression;" was under the care of a Psychiatrist, Marvin Ziporyn, M.D.; said that Novane-Stelazine[9] was not helpful; was

---

[9] Navane and Stelazine are antipsychotic medications that are used to treat schizophrenia. WebMD, http://www.webmd.com/schizophrenia/guide/mental-health-brief-psychotic-disorder#2-6 (last visited Sept. 7, 2017).

14

diagnosed with "#42: Schizophrenia, chronic undifferentiated;" and was deemed unqualified for retention in the United States Naval Reserve due to his mental health condition (R. 469-70).

The Commissioner argues that whether Mr. Potocki had a medically determinable impairment during the relevant time period is of no moment, because he was performing substantial gainful activity when he turned 22 in 1972 (doc. # 16: Def.'s Mem. in Supp. of Mot. for Summ. J., at 4 n. 2). We find this argument unpersuasive for two reasons.

*First*, this argument flies in the face of the ALJ's assessment of medical evidence of Plaintiff's condition prior to the age of 22 years old as "key." The Commissioner's post-hoc dismissal of this evidence as "moot" (doc. # 16: Def.'s Mem. in Supp. of Mot. for Summ. J., at 4 n. 2) cannot be squared with – and cannot trump – the ALJ's own assessment of its importance.

*Second*, there is a "reasonable probability" that evidence of Plaintiff's psychiatric condition prior to the age of 22 years old would have affected the ALJ's assessment of whether Plaintiff's work for his father was performed under "special conditions." Plaintiff's testimony, if accepted, would support that conclusion. Knowing that Plaintiff had an existing serious mental health condition when he commenced that work (after being discharged from the Naval Reserve due to that condition) well may have led the ALJ to view that testimony in a different light. That is particularly so in view of the Seventh Circuit's admonishment that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job." *Wilder*, 153 F. 3d at 801. Put another way, "one can be unemployable yet employed." *Id.*

In light of this "key" new and material evidence, we remand the case to the ALJ to re-evaluate Mr. Potocki's substantial gainful activity and medically determinable impairment during the relevant time frame in light of the diagnosis of schizophrenia in 1970. This diagnosis

fills in many of the unanswered questions, lends credibility to the testimony and statements of Mr. Potocki, Ms. Potocki, the first cousins, and provides corroboration of the mental illness. *Wilder*, 153 F. 3d at 802.

## CONCLUSION

For the reasons stated above, we grant Ms. Potocki's request for remand (doc. # 13), and we deny the Commissioner's motion for judgment (doc. # 15). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:** September 11, 2017